UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

SOPHIE ROGERS, *et al.*,               )
                                       )
    Plaintiffs,    )
                                       )
v.                                     )   Case # 1:19-cv-1149 (RDA/IDD)
                                       )
VIRGINIA STATE REGISTRAR, *et al.*,    )
                                       )
    Defendants.    )

---

DECLARATION OF VICTOR M. GLASBERG
IN SUPPORT OF APPLICATION FOR
AWARD OF ATTORNEYS FEES AND COSTS

---

Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com


Counsel for Plaintiffs

# Contents

Professional Background and Experience ................................................................. 1

The History of This Lawsuit ......................................................................... 7

Work on the Lawsuit .................................................................................. 13

Review of *Johnson* Factors ........................................................................ 17

Summary and Conclusion ............................................................................ 31

In support of my application for an award of attorney's fees and costs, I, Victor M. Glasberg, declare under penalty of perjury that the following is true:

<u>Professional Background and Experience</u>

1. I received my J.D. degree from the University of Pennsylvania Law School in 1976. I also hold a Ph.D. in history from Harvard University, which I received in 1972. My area of specialization was twentieth century race relations in the United States. Upon completing law school I was designated a Reginald Heber Smith Legal Services Fellow, but declined the fellowship in order to accept employment in Philip Hirschkop's Alexandria, Virginia firm doing civil rights work. In March 1982, I resigned from the firm to open my own law practice.

2. From the beginning of my practice in 1976 I have specialized in federal civil rights litigation. I regularly review civil rights decisions and obtain continuing education in civil rights law. Since May 1979, I have served as a volunteer member of the legal panel of the American Civil Liberties Union of Virginia. In this capacity I have participated in reviewing requests for ACLU assistance and in making decisions whether the ACLU will take a proposed case. I am a former chairman of the legal panel. I have also litigated numerous ACLU cases in Alexandria's federal court. In March 1991, I testified before the House Subcommittee on Civil & Constitutional Rights, United States Congress, in support of H.R. 1, ultimately enacted into law as the Civil Rights Act of 1991. I also testified before this subcommittee in October 1986, on civil rights implications of proposed federal legislation, subsequently enacted, regulating the medical profession. In 1985, I served as special counsel to the Alexandria Human Rights Commission relative to a discrimination complaint in relation to which the Alexandria city

attorney could not advise the commission. I served the Prince William County Human Rights Commission in the same capacity in 2006. I have testified in court as an expert in the field of civil rights litigation, and have taught continuing legal education in this field. In May 2019, I participated in a panel on demonstrations and the First Amendment before the 2019 Joint Judicial and Senior [Court] Managers Conference of the District of Columbia Superior Court. From April 1982 to September 1986, I was president of the board of directors of Legal Services of Northern Virginia, Inc., the publicly funded provider of legal services to the poor. I was LSNV's initial vice president, from February 1980 to April 1982. In recognition of my civil rights work, in 1994 I received the Guardian of Liberty Award from the American Civil Liberties Union of Virginia, and in 2017, I received the Oliver White Hill Courageous Advocate Award by the Virginia Trial Lawyers Association. For several years, my firm has been the only Virginia firm named in U.S. News & World Report's "Best Lawyers" in the category civil rights law. https://bestlawfirms.usnews.com/search.aspx?state_code=VA&practice_area_id=109 .

3. Virtually all my practice is in federal court, mostly in Alexandria. I have successfully litigated the following civil rights suits, among others, in this court or the Fourth Circuit Court of Appeals (not including successful cases reversed on appeal, or the instant case): *Porter v. Clarke,* 852 F.3d 358 (4th Cir. 2019) (unconstitutional conditions on Virginia's Death Row enjoined); *Allen v. School Board of Stafford County,* #1:18-cv-518 (E.D.Va. 2018) (First and Fourth Amendment claims for exclusion from public meeting); *Sims v. Labowitz,* 885 F.3d 254 (4th Cir. 2018) (Fourth Amendment claim by minor against police officer who compelled him to expose himself for a "search"); *Henderson v. Jones,* #1:17-cv-676 (E.D.Va 2018) (police assault); *Cook v. Smith,* #1:17-cv-781 (E.D. Va 2018) (wrongful police seizure); *Orsted v.*

*University of Mary Washington,* #3:15-cv-525 (E. D. Va., 2017)($160,000 settlement plus institutional changes arising out of denial of basketball tryout to African-American student); *Graham v. Gagnon*, 831 F.3d 176 (4th Cir. 2016)(unconstitutional arrest); *Williams v. Prince William County,* 645 Fed. Appx. 243 (4th Cir. 2016) (dismissal of employment discrimination claim reversed); *Rogers v. Stem,* 590 Fed. Appx. 201 (4th Cir. 2014) (unconstitutional arrest); *Garcia v. Daniel,* 2013 WL 75969 (E.D. Va. 2013)(excessive police force case; $1M offer of judgment accepted after qualified immunity appeal dismissed); *Walker v. Correct Care Solutions, LLC,* #1:10-cv-1012 (E. D. Va. 2011)(prison death case; $1M offer of judgment accepted); *Willingham v. Crooke,* 412 F.3d 553 (4th Cir. 2005)(establishing rule that qualified immunity is to be decided by the court, not the jury; new trial ordered); (*Amaechi v. West*, 237 F.3d 356 (4th Cir. 2001)(strip search; settled after qualified immunity appeal dismissed); *Noviks-Tucker v. Law School Admissions Council, Inc.*, C.A. #00-1971-A (E.D. Va. 2000) (injunction granted requiring accommodations in law school admissions test for sight-impaired student); *Warren v. Fairfax County*, 196 F.3d 186 (4th Cir. 2000) (*en banc*) (county's restriction of access to government center public forum to county residents enjoined); *McNew v. Surry Cty. Sch. Bd.*, C.A. #3:99cv381 (E.D. Va. 1999) (following preliminary injunction, public school board reverses expulsion of student for coloring his hair blue); *Alexandria Resident's Council v. Alexandria Housing & Redevel. Auth*., 153 F.3d 718 (4th Cir.1998) (co-counsel) (case of first impression establishing the right of public housing tenants to hold municipal housing authority to federal obligations); *Trinity Baptist Church v. City of Richmond*, C.A. #3:97cv637 (E.D. Va. 1997) (city enjoined from enforcing ordinance restricting charity feeding of the homeless pending rewriting of liberalized ordinance); *Clark v. Virginia Board of Bar Examiners*, 880 F.

Supp. 430 (E.D. Va. 1995) (bar examiners' rule violating American With Disabilities Act enjoined); *Steckbeck v. Williams*, C.A. #93-1373-A (E.D. Va. 1994) (DMV censorship of license plate enjoined); *Gearon v. Loudoun County School Board*, 844 F. Supp. 1097 (E.D. Va. 1993) (public school prayer enjoined); *Gneckow v. Kelso*, C.A. 93-290-A (E.D. Va. 1993) (damages awarded for sex harassment and retaliation); *Arlington County Republican C'ee v. Arlington County*, 790 F. Supp. 618 (E.D. Va. 1992), *modified*, 983 F.2d 587 (4th Cir. 1993) (unconstitutional county sign ordinance enjoined); *Barry v. Alexandria School Board*, C.A. #92-296-A (final order entered May 18, 1992) (racially discriminatory procedure for determining admission to full-day kindergarten abandoned); *French Quarter, Inc. v. Hampton*, C.A. #91-1180-A (E.D. Va. 1991) (unconstitutional Virginia statute discriminating against homosexuals enjoined); *Iota Xi Chapter v. George Mason University*, 773 F. Supp. 792 (E.D. Va. 1991) (student discipline violating First Amendment enjoined); *Wilson v. Westgate Apartments Ltd. P'ship* (E.D. Va. 1991) (damages awarded for race discrimination in housing); *No. Va. Chapter ACLU v. Alexandria*, 747 F. Supp. 324 (E.D. Va. 1990) (unconstitutional city loitering ordinance enjoined); *Holland v. First Va. Bank*, 744 F. Supp. 722 (E.D. Va. 1990) (damages for race discrimination under Title VII; separate verdict under §1981 reversed on appeal); *Bradley v. Carydale Enterprises*, 707 F. Supp. 217 (E.D. Va. 1989) (damages awarded against landlord for race discrimination by tenant; case of first impression nationally); *Budd v. Gondles*, C.A. #88-118-A (final order entered Aug. 16, 1988) (sheriff's deputies reinstated with back pay following unconstitutional demotion); *Bell v. Arlington County*, 673 F. Supp. 767 (E.D. Va. 1987) (vague county criminal ordinance enjoined); *Bryant v. CSN Management Company*, C.A. #86-1264-A (E.D. Va. 1987) (housing discrimination enjoined); *Culver v. Lineweaver*, C.A. #85-1263-A

(E.D. Va. 1986) (voting redistricting mandated); *Jackson v. McKoy*, C.A. #84-1240-A (E. D. Va. 1985) (racial discrimination in public accommodations enjoined); *Davenport v. City of Alexandria*, 748 F.2d 208 (4th Cir. 1984) (overbroad city ordinance enjoined); *McElveen v. Prince William County*, 725 F.2d 954 (4th Cir. 1984) (substandard jail ordered closed; inmate class awarded damages by jury); *Rout v. Gen'l Services Admin.*, C.A. #84-491-A (final order entered Sept. 24, 1984) (government agrees to conform to handicap-accessibility standards at the former Alexandria federal courthouse); *Bennet v. City of Alexandria*, C.A. #81-649-AM (final order entered Jan. 17, 1984) (city agrees to upgrade life-safety systems and medical care in former city jail and build new facility under set timetable); *Harrington v. Quintin*, C.A. #82-3296 (final order entered Jan. 3, 1983) (racial discrimination at skating rink enjoined and plaintiffs paid damages) *Fiedler v. Marumsco Christian School*, 631 F.2d 1144 (4th Cir. 1980) (racial discrimination in education enjoined); *Northern Virginia Women's Medical Center v. Balch*, 617 F.2d 1045 (4th Cir. 1980) (civil conspiracy against women's medical facility enjoined).

4. In the District of Columbia I prevailed in *Hinett v. British School of Washington,LLC,* #2017-CA-6005 B (Super. Ct. D.C. 2019) (disability discrimination case under D.C. Human Rights Act); *Izuka v. Clark Realty Capital, LLC*, #1:18-cv-2087 (D.D.C. 2019) (pregnancy discrimination); *Doe v. United States Postal Service*, 37 FEP Cases 1867 (D.D.C., 1985), awarding damages to a transsexual employee victimized by employment discrimination, case of first impression under the Rehabilitation Act of 1973. In January 1999, without filing suit I obtained $150,000 in damages for several female inmates of the Arlington County Adult Detention Center, as well as causing the overhaul of policies and procedures designed to prevent

and to deal with sexual abuse of female inmates by guards.  I served as appellate counsel in *De'lonta v. Angelone*, 330 F.3d 630 (4th Cir. 2003), securing a reversal of the court's dismissal of a *pro se* transsexual inmate's medical claim, and thereafter negotiated a settlement requiring the Department of Corrections to treat inmates with Gender Identity Disorder.  Ten years later I served as appellate counsel for the same inmate, this time securing reversal of the Department's refusal to consider her for sex reassignment surgery.  *De'lonta v. Johnson,* 708 F.3d 520 (4th Cir. 2013).  During the period 2012-2015, acting on my own and without a client or pending lawsuit, I succeeded in convincing the Virginia Supreme Court to promulgate new written guidelines for warning defendants in criminal cases of possible adverse immigration-related consequences were they to plead guilty, thus addressing a grave problem previously affecting the non-English-speaking population in Prince William County and elsewhere in the Commonwealth.  I also requested and received a Legal Ethics Opinion from the Virginia State Bar to the effect that it is unethical for a prosecutor knowingly to permit a deportable alien to plead guilty to a crime that might, without the defendant's knowledge, yield deportation.

5.  I have on a few occasions represented defendants in cases with civil rights, particularly First Amendment, overtones favoring the defense: *1007 LLC v. The Alexandria City Council*, Ch. #4001399 (Cir. Ct. Alexandria, 2005) (lawsuit against homeowners' association for having petitioned city council dismissed; sanctions awarded); *Gibson v. City of Alexandria*, C.A. #94-373-A (E.D. Va. 1994) (dismissal on First Amendment grounds of claim for allegedly wrongful lobbying of city council); *Taylor v. Kuckro*, Law #970848 (Cir. Ct. Alex.1998) (dismissal on First Amendment grounds of lawsuit against television political commentators).  I served as chief defense counsel to C.B.S., Inc. and Chrysler Corporation in *Delaware Chapter,*

*Ukrainian Congress C'ee v. C.B.S., Inc.*, C.A. #87-306-JJF (D. Del., dismissal order entered Sep. 13, 1988) (federal civil rights challenge to a nationally telecast screenplay recounting an escape from a Nazi death camp). Also: *United States v. Shoupe*, Crim. #85-287 (E.D. Va., order entered March 6, 1987) (government dropped demand that federal probationer marry his girlfriend as condition of probation); *United States v. Rein*, Special Court Martial, United States Navy, Atlantic Judicial Circuit (charges withdrawn, Feb. 3, 1981) (charges against sailor for having posed nude in *Playboy* magazine dismissed); *United States v. Berrigan*, Crim. #97176-77 (Super. Ct. D.C. 1978) (pacifist demonstrators acquitted of White House trespass charge). I have on a few occasions also successfully represented defendants in meritless employment discrimination claims, *e.g.*, *Jarvis v. The Christmas Attic,* #1:12-cv-1010 (E. D. Va. 2012); *Pratt v. Walmer Enterprises, Inc*., C.A. #98-1588-A (E.D. Va. 1999) (sanctions imposed). I have also written *amicus curiae* briefs for the Virginia ACLU in civil rights cases, *e.g.*, *Cord v. Gibb*, 219 Va. 1019, 254 S.E.2d 7 (1979) (cohabitation held no basis for exclusion from state bar), and have served as local counsel in this court on other major First Amendment cases, *e.g.*, *American Booksellers Assn., Inc. v. Strobel*, 617 F. Supp. 699 (E.D.Va. 1985), *rev'd* 882 F.2d 127 (4th Cir. 1985) (unsuccessful First Amendment challenge to statute regulating display of material deemed harmful to juveniles), and *El Masri v. Tenet,* 437 F.Supp. 2d 530 (E.D. Va. 2006), *aff'd* 479 F.3d 296 (4th Cir. 2007) (unsuccessful challenge to government torture and rendition policy).

The History of This Lawsuit

6. The roots of this lawsuit lie in a 1975 paper I wrote in law school called *Race, Affirmative Action and the Law.* In that paper I developed the theory that racial categorization is

unlawful *per se,* as it is based on outdated, scientifically valueless concepts fraught with

discrimination and prejudice against non-white persons.[1]  In 1981, when my wife-to-be and I

applied for our marriage license, I objected to being required to state my "race."  I was told that I

had to enter a race, and that "human" would not do.  So I entered "'white'" in quotation marks.

It was at this time, a few weeks before our wedding, that I understood why this obnoxious

requirement, of which I had previously been unaware, had never been challenged and remained

on the books.  People planning a wedding make a myriad arrangements for the occasion well in

advance of obtaining their marriage license – something that takes several minutes and then is

valid for only sixty days – and will be unwilling (as we were) to put everything on hold pending

the initiation and conclusion of a lawsuit.  I made a mental note to myself to challenge this law if

it was not revoked by the General Assembly.

7.  In 2003, the General Assembly revoked the requirement of racial labeling on marriage

license applications, only to make it mandatory once again the following year.  I could find no

legislative history explaining this reversion.  I concluded that a permanent judicial fix, rather

than an uncertain and reversible legislative one, would be needed.

8.  My small (2-lawyer) but active civil rights litigation practice, almost entirely in this

court, did not give me much time to devote to this matter for some years.  In April 2014, in

connection with a presentation I made on historical discrimination and civil rights, I decided to

_____

[1]As I did in the complaint in the instant suit, I distinguished between discriminatory racialization
on the one hand, and on the other the need to be aware of "race" in order to extirpate racism and
deal with its consequences.  In 1975, the Supreme Court provided a legal justification for
addressing the consequences of past racialization, in *Shaarei Tefilla Congregation v. Cobb,* 481
U.S. 615 (1987) and *St. Francis College v. Al-Kazraji*, 481 U.S. 604 (1987) (Jews and Arabs not
races, but protected by 42 U.S.C. §1981 prohibiting race discrimination because of the extensive
historical evidence they had been racialized).

begin work developing a record that would justify a permanent injunction against the race-labeling provision. I did not know if the state would acquiesce in the demise of its 2004 incarnation of this requirement, and I did know that a federal court will not lightly strike down a provision of state law as unconstitutional. So I determined to build as overwhelming a case as possible, so as to present a federal judge with what was needed to conclude that the racial labeling provision should be struck by reason of its malignant history and practical disutility.

9. My initial effort in this regard was to read a host of books and articles on the history and sociology of American race relations, and to educate myself regarding the developing science of human genetics. The books I read (in one case re-read), in whole or in part, include the following, among others:

Cashin, *Loving* (Beacon 2017)

Gross, *What Blood Won't Tell* (Harvard U.P. 2008)

Guglielmo, *White on Arrival* (Oxford U.P. 2003)

Hartigan, ed., *Anthropology of Race* (SAR Press 2013)

Higgenbotham, ed., *Race Law* (4th ed., Carolina Acad. P. 2015)

Hobbs, *A Chosen Exile* (Harvard U.P. 2014)

Hochschild, *et al., Creating a New Racial Order* (Princeton U.P, 2012

Jacobson, *Whiteness of a Different Color* (Harvard U.P. 1998)

Jordan, *White Over Black* (U.N.C. P. 1968)

Koenig *et al*, eds., *Revisiting Race in a Genomic Age* (Rutgers U.P. 2008)

Lukasik, *White Like Her* (Skyhorse 2017)

Lopez, *White by Law* (N.Y.U. P. 1996)

Markus, ed., *Doing Race* (Norton 2010)

Mukerjee, *The Gene* (Scribner 2016)

Omi *et al., Racial Formation in the United States* (Routledge 1994)

Painter, *The History of White People* (Norton 2010)

Pascoe, *What Comes Naturally* (Oxford U.P. 2009)

Prewitt, *What is **Your** Race?* (Princeton U.P. 2013)

Roediger, *Working Toward Whiteness* (Basic Books 2005)

Sussman, *The Myth of Race* (Harvard U.P. 2014)

Wade, *A Troublesome Inheritance* (Penguin 2014)

Whitman, *Hitler's American Model* (Princeton U.P. 2017)

I also sought out and read dozens of articles on human genetics, racial identification, racial ambiguity, and racial passing, and history related to the subject at hand. And I read dozens of reported decisions of lawsuits in which courts struggled with who was and was not white, with the consequences that this had (in pre-emancipation cases) for freedom and (in post-emancipation cases) for citizenship and other entitlements. I did not track my time doing most of this reading, which I normally did in the evening and on weekends at home and which came to several hundred hours over the course of five years. I request compensation for 50 hours of this time, representing perhaps 10% of the time involved.

10. My next task was identifying highly qualified experts to support the claims I proposed to make regarding the historical origins of Virginia's racial labeling laws, the significance of conventional racial categorization from the standpoint of genetic and medical research, and the disutility of conventional racial labeling from a public policy standpoint. It

was my intent to file experts' statements together with the complaint, so as to render the averments properly supported from an evidentiary standpoint and not amenable to dismissal as unduly speculative under *Iqbal v. Ashcroft*, 556 U.S. 662 (2009), and, as well, to facilitate a summary adjudication of the case as promptly as possible. To this end, in the period 2014-19 I wrote to several dozen historians, geneticists, and sociologists, seeking to gain their support for this project. I found the persons to whom I wrote from their own publications that I read, or from being cited in works I had read. I got the name of my first expert in human genetics, Sarah Tishkoff, from the geneticist at the University of Pennsylvania to whom I had turned as an expert in 1975 when writing my paper in law school. Thirty-nine years later he referred me to her. In the end, I filed six sworn experts' statements together with the complaint: three from historians, two from human geneticists, and one from the former director of the United States Census Bureau. While I did not get responses from many academics to whom I wrote, I received only one (partially) negative response, from a historian who doubted that a court would strike the race labeling requirement regardless of its inappropriateness.[2]

11. My plan was to file a fact-filled complaint supported by declarations from prominent academics and scientists, with the declarations being sworn to under penalty of perjury so as to be admissible into evidence on summary judgment. The complaint would then double as a statement of uncontested facts for purposes of an intended motion for summary judgment, to be filed as soon as possible depending on the defendants' response to the complaint. This strategy

---

[2]Identifying historians with the requisite background and the time to devote to this project proved especially challenging. Except for my ongoing reading, the entire project was repeatedly on hold for months at a time as I tried and failed to secure the academic assistance I believed necessary to support my presentation of the history of §32.1-267 in the complaint. In 2019, things fell into place on this score, with three historians agreeing to participate.

worked as intended: One week after suit was filed, the defendants effectively conceded the merits of the substantive claim, mounting only a legal defense to plaintiffs' summary judgment motion. They did not contest any of plaintiffs' proffered undisputed facts. Through the conclusion of this case, the plaintiffs' abundant factual evidence presented in the complaint, and their experts' submissions, stood uncontested before the court, subject only to defendants' mootness defense. The court's memorandum opinion [ECF 50] notes and reflects the uncontested nature of plaintiffs' averments.

12. Once I had secured the support of my experts and we had finalized their declarations, I had to identify plaintiffs. I had not been concerned about getting plaintiffs: people get married all the time and I was confident that I would be able to find persons willing to sign on to the case. 13. My initial plaintiffs were my associate Bernadette Valdellon and her then-fiancé. My 2019 summer intern, who worked on the case, alerted friends of hers who were planning to get married in Virginia, and they were pleased to join. This was Ashley Ramkishun and Samuel Sarfo. Thereafter, a former intern who came by the firm to say hello learned about the case over lunch, and she and her intended joined as well. This was Amelia Spencer and Kendall Poole. Several weeks before suit was filed, I was contacted by another couple – Sophie Rogers and Brandyn Churchill – who had learned of the suit from a friend of mine who teaches at Washington & Lee Law School where Ms. Rogers is a student. It was their already-planned wedding date of October 19, 2019 that propelled the filing of suit as promptly as possible, as I anticipated a hearing on a preliminary injunction to permit the couple to get their race-less marriage licenses in time for their wedding. It proved, however, impossible for me to complete the necessary filings in time to retain my associate and her then-fiancé as plaintiffs. Their

wedding had been set for September 3 and was not going to be moved to accommodate the

lawsuit.  I filed suit on September 5, 2019, noting a hearing on a preliminary injunction for

October 4.

    <u>Work on the Lawsuit</u>

14.  The principal work associated with litigating this case involved combining the results

of my research into history, legal history, sociology, and genetics into a complaint that did not

inappropriately tax the court, was consistent with what my experts were prepared to assert, and

suffced to establish a firm ground for the relief I sought in the case, and specifically for a

summary judgment motion I planned to file.   To this end I had to draft and continuously revise

the complaint in tandem with the slow but steady identification and development of evidence

from the six academics who ultimately filed declarations supporting, among them, the material

allegations of the complaint other than personalized information regarding the six plaintiffs.

15.  I began work on the complaint in June 2019, calling it my "Brandeis complaint" by

reason of the abundance of supportive data I was putting into it.  Initial drafts – naming only my

associate and her then-fiancé as plaintiffs – outlined what I intended to allege, to the extent

supported by appropriate authority and my experts.  The initial drafts also named Governor

Northam and Attorney General Herring as defendants – something I later determined was

inappropriate.  I then spent weeks revising and filling in details from the considerable historical

and scientific material I had amassed over the course of five years, and modifying the complaint

in accordance with the fine-tuning of my academic experts' declarations.

16. I decided at the outset to attach numerous exhibits to the complaint – something I ordinarily do not do but that I deemed important in this case given their unimpeachable nature, their probative value, and my desire to preclude factual debates and facilitate summary adjudication of the case as promptly as possible. Having read previously published material by most of my experts, I asked several of them to attach to their declarations copies of articles written by them that went to the heart of the lawsuit. *See*, articles appended to the declarations of Sarah Tishkoff, Marcus Feldman, and Paul Lombardo.

17. I undertook to secure permission to use some copyrighted material as exhibits, as I had received conflicting information from intellectual property counsel as to whether use of copyrighted material as an exhibit to a complaint filed in court constituted "fair use" for which permission was not needed. In 2016 I found the work of Angelica Dass, the Brazilian photographer who created the photographic array of people of different shades and hues that appears as Exhibit 10 to the complaint. Starting in 2016, I corresponded by email with Ms. Dass and her assistant to the end of successfully securing her agreement for me to use her work in the complaint. In April 2018 I first saw the photograph of the Biggs twins appearing as Exhibit 11. I went through *National Geographic,* which had published the photo, to the photographer, a New Zealander, who agreed to my use of the photograph. While I could have secured permission to file a brief section of Peggy Pascoe's book *What Comes Naturally* regarding Virginia's Racial Integrity Act of 1924, Oxford University Press sought $750 for the privilege. This was excessive, so instead I purchased several copies of the book and remitted them to chambers and counsel after the court granted my motion for leave to do so. I had two of my historian experts attest to the authoritative nature of Prof. Pascoe's book, rendering it competent evidence.

18.  In aid of providing adequate historical context to the race-labeling law, I had to track down the statutory predecessors of the current Va. Code Ann. §32.1-267.  While my summer intern was able to find the more recent relevant historical Virginia statutes, all of the older pertinent ones are not available on line, and had to be researched and found in hard copy at law school libraries.  My summer intern made arrangements to have a law student from the University of Virginia Law School retrieve a copy of Walter Plecker's letter in which he compared his geneological work favorably to Hitler's geneological work on Jews.  (Exhibit 9 to the complaint.)

19.  In late July, I sent an already highly revised version of the draft complaint to several friends known to me as highly capable lawyers specializing or with considerable experience in civil rights litigation.  The responses led to a substantial revision (and shortening) of the complaint.  It led as well to the removal of the governor and attorney general as defendants, in favor of the state registrar and the clerks of court from whom the intended plaintiffs had sought a marriage license.  Initially this did not include the Rockbridge Circuit Court clerk, as Ms. Rogers and Mr. Churchill had not yet joined the suit or applied for their marriage license.

20.  On September 5, 2019, I filed the complaint, with nine exhibits, and a motion for a temporary restraining order or preliminary injunction on behalf of Ms. Rogers and Mr. Churchill, together with a documentary appendix of nine sworn declarations: those of two human geneticists, three historians, the former director of the United States Census Bureau, my two clients planning to wed on October 19, and my own declaration providing an evidentiary basis for several exhibits to the complaint.   I noticed the matter of a hearing on October 4.  All this

was served the following day on each defendant, with courtesy copies served on the attorney general and on the governor.

21. Together with the lawsuit filings, I served on all recipients the original or copies of identical letters to the attorney general and governor asking that the case not be defended:

> I am writing to you because I think this case should not be defended by the Commonwealth. I am asking you to read the complaint and exhibits, acquaint yourself with Virginia's horrendous history regarding the matters at issue, review the declarations and other material submitted in support of my motion for a temporary restraining order, and do what must be done to get on the right side of history: have the defense stipulate to the unconstitutionality of the provision at issue. I am making the same request of Governor Northam and copying Lieutenant Governor Fairfax for his information, as well as the defendants.
>
> Racial justice is important to all of us. This is an occasion for Virginia to get rid of possibly the last vestige of *de jure* Jim Crow on our books, by invoking, as Lincoln invoked in his First Inaugural Address, "the better angels of our nature."

A copy of my letter appears as Exhibit 1 in the documentary appendix filed herewith.

22. In response to the lawsuit, the attorney general issued a memorandum conceding that "At a minimum, any statute requiring a governmental official to deny a marriage license to an applicant who declines to provide information about his or her race would raise serious constitutional questions." *See*, Exhibit J to plaintiffs' motion for summary judgment. And one hour after the court's September 11, 2019 memorandum order was published on line, the attorney general's communication director issued a press release to the effect that the court's finding was "consistent (*sic*) with AG Herring's recent memo to the State Registrar." Exhibit 2.[3]

---

[3]This was a remarkable statement considering the court's observation that the attorney general "provided a construction of the statute that is expressly at odds with its plain meaning." Slip op. at 16.

Why, then, the suit was defended, thereby requiring work that might – should – have been avoided, remains a mystery. And why the defendants insisted on continuing to use an application form that sought racial identification even after the court ruled this inquiry unconstitutional – thereby causing more legal work to be done – is an even greater mystery.

### Review of *Johnson* Factors

In the paragraphs that follow, I review the factors relevant for assessment of an application for a court-awarded fee pursuant to *Johnson v. Ga. Hwy. Exp.*, 488 F.2d 714 (5th Cir. 1974), adopted by the Fourth Circuit in *Barber v. Kimbral, Inc.,* 577 F.2d 216 (4th Cir. 1978). In further support of this application, I submit the declarations of Bernard DiMuro (Exhibit 3 at 4-6); Elaine Bredehoft (Exhibit 4, ¶¶11-19); Harris Butler (Exhibit 5, ¶¶12-20); Steven Rosenfield (Exhibit 6, ¶¶4-10); Arthur Spitzer (Exhibit 7, ¶¶2-8); Michael Allen (Exhibit 8, ¶¶9-22) and Stephen Cochran (Exhibit 9, ¶¶ 2-11). The declarations appear in the documentary appendix filed herewith.

23. <u>Time and Labor Required</u>. As set forth above, most of the work on this case took place before suit was filed, in the form of developing evidence intended to discourage a vigorous defense of the merits and facilitate an early resolution. To this end, I wrote and had verified a complaint intended to double as a statement of undisputed material facts for purposes of summary judgment.[4] In addition to drafting the complaint, the principal additional work, taking

---

[4] Plaintiffs' proffered undisputed facts in support of their motion for summary judgment were their verified allegations and exhibits filed with the complaint [ECF 1, 7, 9], plus a single new document: the attorney general's post-filing memorandum conceding constitutional problems with the race-labeling requirement and interpreting the law to mean the opposite of what it said. ECF 18 at 3-4.

place June through September, 2019, was perfecting the motions and memoranda intended to advance the litigation rapidly once filed: the motion for preliminary injunction/temporary restraining order filed with the complaint, and – three business days after receipt of the defendants' motion to dismiss – the motions for summary judgment and a permanent injunction combined with a reply addressing defendants' mootness defense.  The only work done in October was on my post-judgment motion for enforcement of the court's ruling, required by defendants' misperception of the court's ruling and on the instant application.  I sent an almost-final copy of this declaration to defense counsel, soliciting informal resolution of plaintiffs' fees and costs.  The latter effort having come to naught, this application is now being filed.

24.   The work done by my firm on this case is set forth in the itemization of hours attached hereto as Exhibit 10.  My own work can be broken down into the following major categories, provided that the categories – like races – are after-the-fact recreations that in many instances blend into one another.  I do not seek compensation for all this work.

<u>April 2014 - May 2019</u>                                                                                             <u>Time</u>

\*        Ongoing efforts via mail, email, and telephone to secure

         expert historians, sociologists, and geneticists; revise draft

         statements of Profs. Tishkoff, Feldman and Prewitt;

         extensive back-and-forth *re* revisions of statements to meet

         the needs of the suit and of the experts.  (This does not include

         about 500 hours spent reading referenced in ¶9.)                                    57.8

\*      Draft, revise, and finalize complaint, using law clerk and

paralegal work product on racial identification by the U.S.

Census Bureau and state requirements for race on marriage

license applications; substantial ongoing revision through filing,      65.5

\*      solicit and incorporate criticism of draft by outside civil rights counsel,      10

\*      Select the exhibits to the complaint; obtain authority

to use copyrighted material; motion to file book in court,      9.5

\*      Solicit and revise expert historical statements

from Profs. Guglielmo, Jacobson, and Lombardo,      8.9

\*      Revise and finalize motion for preliminary injunction or

temporary restraining order initially drafted by law clerk Phillips,      18.3

\*      Select exhibits to the memorandum in support of

TRO/injunction motion,      5

\*      Multiple communications with plaintiffs Ramkishun, Sarfo,

Rogers and Churchill; teleconfs with opposing counsel,      3.2

\*      Preliminary draft reply to anticipated motion to dismiss

on mootness grounds,      6.3

September 26 - 30, 2019[5]

\*      Read defendants' motion to dismiss, assign research to be done,

draft and finalize reply/opposition memorandum *re* mootness,      31.3

---

[5]None of the work done after September 5 would have had to be done had the defense agreed not to defend the suit, as I proposed in my letter served with the complaint (Exhibit 1).

| | | |
|---|---|---|
| * | Draft and finalize motion for summary judgment and supporting memorandum, | 11.9 |
| * | Draft and finalize motion for permanent injunction, | 3 |
| * | Prepare for hearing on motions and argue motions, | 13.9 |

October 1-31, 2019

| | | |
|---|---|---|
| * | Review time, begin work on fee application to meet 2-week deadline, | 11.5 |
| * | Finalize fee application following receipt of judgment, | 3.6 |
| * | Motion to enforce court's order re application fee | 7.2 |
| | Total posted time | 266.9 |
| | Time spent, 2014-2019, reading books and articles per ¶9 above, | est. 500 |
| | **Total time (including estimated reading time)** | **766.9** |

25.  All the extensive pre-filing work into the history of Virginia's requirement of racial categorization proved necessary, given the defense of the lawsuit.  The defendants took the position, both in their motion to dismiss and in oral argument, that there was "no straight line" between the racism animating the Virginia Racial Integrity Act of 1924 and the existing law requiring racial labeling passed in 2004 – one year after the requirement had been temporarily stricken.   Anticipating such a defense, I had elaborated the history of the Virginia's marriage laws to demonstrate that the requirement of racial labeling – which the defense conceded served no legitimate purpose – amounted to no more than a retrograde throwback to the historical and unyielding insistence of Virginia legislative and judicial authorities that whites and non-whites not marry.   Having reviewed the history set forth in the complaint, the court agreed: "The statutory scheme is a vestige of the nation's and of Virginia's history of codified racialization."

Slip Op. at 6.

26.  From the total amount of time I devoted to this case from 2014 to date, I have deleted the following for purposes of this application:

* all hours above 50 spent reading the books and articles named in ¶9 above, amounting to perhaps 10% of the time actually spent,

* hours spent on many of the over 1200 emails I have in my e-file on this case that, while appropriate at the time, did not end up materially advancing the case,

* all time reasonably deemed unproductive or duplicative in light of results of subsequent research or writing,

My own time for which I seek compensation is 257.2 hours, comprised of the following:

* 200 hours of work, excluding (a) background reading and (b) work on the motion to enforce the court's order.  To account for false starts, duplicative work, or the like, this figure represents more than a 20% reduction of the time spent in actual litigation work other than the motion to enforce the court's order.

* 50 hours of background reading, amounting to a reduction of possible 90% of the time I actually spent in this research during 2014-2019, and

* 7.2 hours spent on the motion and supporting memoranda to enforce the court's order given defendants' continued use of the race question.  I have not reduced any time from this work, which I believe should not have had to be done at all.

27.  In preparing this case I received the assistance of an associate, a research assistant, several paralegals, and several interns.  Their work, like my own, is itemized in Exhibit 10.  I seek compensation for some of their time, as follows:

\*      Associate Bernadette Valdellon, June - September 2019

      Research requirements of 50 states plus D.C. re race on marriage

      license applications; research same re dozens of Virginia circuit courts;

      prepare chart with statutory citations        30

      **(43.7 additional hours not billed as work product not used)**

\*      Senior Research Ass't Charles Tierney, Aug. - Sep. 2019

      Research and draft memos re substantive due process,

      compelled speech, standing, and mootness; assemble exhibits    40

      **(36.5 additional hours not billed as work product not used)**

\*      Law clerk Stacey Gray, May - Oct. 2014

      Research and draft memo on historical federal racial

      classifications by Census Bureau and various federal agencies    40

      **(35.9 additional hours not billed as work product not used)**

\*      Law clerk Mikaela Phillips, June - August 2019

      Research on compelled speech theory; cite-checking cases from Lopez,

      *White By Law*; research legislative history of statute; research

      availability of injunction; proofread and cite-check final documents    100

      **(71.7 additional hours not billed as work product not used)**

28.  My associate Bernadette Valdellon has been with my firm since December 2018. She is a 2013 graduate of Santa Clara University School of Law, a member of the District of Columbia Bar, and in the process of waiving into the Virginia Bar.  Ms. Valdellon researched the

marriage laws of all 50 states and the District of Columbia and prepared a chart setting forth any race-related inquiries appearing in any statute or regulation dealing with marriage license applications. She edited and proofread all our major filings in the case. Her billing rate is $250/hour, well within the range of reasonable rates for counsel of her years of experience. *See also*, supportive declarations filed herewith as to the reasonableness of this rate.

29. My senior research assistant Charles Tierney has been with my firm since 2011. A highly experienced and knowledgeable non-practicing lawyer, he has been the firm's principal researcher since joining the firm. He researched and drafted memos that I used to turn into memos filed on behalf of plaintiffs in court. His billing rate, reflecting his formal non-lawyer status rather than the value of his decades of experience as a litigator, is $250/hour. *See also*, supportive declarations filed herewith as to the reasonableness of this rate.

30. Stacey Gray and Mikaela Phillips were law student interns who worked in my firm during the years that this case was developed. I assigned both of them research projects that yielded memoranda in aid of the various briefs I filed in the case. Ms. Gray's research initially led to earlier versions of the complaint setting forth the chaotic and arbitrary classification and reclassification of various groups of persons as white or non-white by the U.S. Census Bureau and other federal agencies. I omitted much of this data from the final complaint, and for that reason have subtracted 70 of Ms. Gray's 110-hour project investigating federal racial classification. Mikaela Phillips researched and drafted memoranda on compelled speech; cite-checked cases identified in secondary sources; prepared a comprehensive analysis of the legislative history of Virginia laws on race, including securing, from law school libraries, copies of laws not available on line; researched the availability of injunctive relief for all the plaintiffs;

and proofread and cite-checked the final documents filed in court.  Ms. Gray's and Ms. Phillips' billing rate is $120/hour.  *See also* supportive declarations filed herewith as to the reasonableness of this rate.

31.  <u>Novelty and Difficulty of the Issues</u>.   Until I received defendants' motion to dismiss this suit on mootness grounds, I thought there was only one issue in this case: whether the requirement of racial labeling set forth in §32.1-267 was constitutional.  I could imagine certain arguments being made in defense of racial labeling, whether from the standpoint of what passes for genetics in some circles (*See A Troublesome Inheritance* by Nicholas Wade, *supra* at ¶9), or based on vague claims about the generic utility of demographic information regarding people getting married.  I deemed any such arguments worthless, but given the difficult history of racial issues in Virginia, and the General Assembly's re-introduction of racial categorization into marriage license applications in 2004, I thought it necessary to develop a record that might nullify such arguments from the outset.  To this end I included allegations and supporting declarations regarding the scientific and policy-oriented disutility of conventional racial classification exemplified by Virginia's racial labeling scheme.  On summary judgment, the defendants did not undertake to contest any of these sworn averments.

The proposed lawsuit presented a case of first impression so far as I could determine. What was most challenging was summarizing the abundant historical, legal, scientific and sociological information I had developed in a complaint appropriate to present to a court, not a classroom.

I anticipated that defendants might not challenge the plaintiffs on the merits, and attempt, rather, to moot the case by stipulating to the unconstitutionality of the race-labeling requirement.

In order to keep the case on track for the October 4 hearing, prior to receiving defendants'
motion to dismiss on mootness grounds I had written an anticipated opposition to such a motion,
largely predicated on mootness issues addressed in *Porter v. Clarke,* 852 F.3d 358 (4th Cir.
2017), which I had litigated in this court and in the Fourth Circuit last year and in 2017.  What I
did not anticipate was that the defendants would adopt the position that the statute at issue meant
the opposite of what it plainly said.  Contrary to the position taken in *Bostic v. McDonnell,* Case
#2:13-cv-395 (E.D. Va. 2014) (ECF 97 at ¶¶49, 51), in this suit the attorney general encouraged
state officials to violate Virginia law and risk criminal charges and removal from office for
dereliction of duty, or voter disapproval in the future, by styling the race labeling requirement
"optional."  On receipt of defendants' motion to dismiss, in an effort to preserve the scheduled
hearing date we researched and briefed the necessary additional points and filed our brief
opposing dismissal three business days after receipt of the motion to dismiss.

32.  <u>The Skill Required to Perform the Legal Services</u>.  This is best assessed by the court,
which received the work product produced by my firm and is in the best position to assess the
skill with which it was performed.  *See also* the supportive declarations filed herewith. My
background as a student and teacher of the history of American race relations was useful to me in
developing and presenting the case.  The case was defended principally by Virginia's solicitor
general in person – an indication, I thought, of the seriousness of the challenge perceived by the
defense.[6]

33.  <u>Preclusion of Other Work</u>.  The background reading referenced in ¶9 *supra,* did not
for the most part take the place of other legal work I would have done.  Otherwise, 100% of the

---

[6]Private and county counsel entered an appearance for the two clerks of court but did not file
separate briefs in defense of the case, simply joining those of the solicitor general.

hundreds of hours of work done by my firm on this case, at no fee, was preclusive of work we would otherwise have done for other clients. We are a permanently busy litigation firm, almost entirely in the "Rocket Docket."

34. <u>Customary Fee for Like Work</u>. From my work in the field of plaintiffs' civil rights litigation over the course of four decades, I am aware that the only persons and entities that do this work are a relatively small number of private civil rights practitioners, mission-driven public interest organizations, the United States Department of Justice, and *pro bono* departments of major law firms. None of these persons or entities charges fees for this work. With negligible exceptions, in every civil rights case in which I have been involved, my fee has been paid pursuant to 42 U.S.C. §1988 or on a contingent basis in the event of settlement for money damages without trial.

35. <u>The Nature of the Fee</u>. I undertook this case in the expectation of receiving a fee, if at all, by agreement with the defense or pursuant to a court award following an application under 42 U.S.C. §1988. My clients are not obligated to me for a fee.

36. <u>Time Limitations</u>. There were no materially significant time limitations imposed by the clients or the circumstances, except, at the end, to meet the scheduling needs of the intended plaintiffs. As noted, time did not suffice for me to file suit on behalf of my initial plaintiffs. Once Ms. Rogers and Mr. Churchill joined, I had to conclude the necessary documentation promptly so as to permit adjudication in time for their October 19, 2019 wedding.

37. <u>The Results Obtained</u>. The result of the lawsuit was an unqualified success, and not only for the plaintiffs. I deem the success meaningful for all Virginians, including particularly those seeking marriage licenses in the future, for persons in several other states with similar laws

which will now be challenged if they are not voluntarily changed, and in a larger sense for civil rights enforcement generally, relative to the practical problem tactical mooting causes for the enforcement of our civil rights laws.

38.  <u>The Experience, Reputation and Ability of Counsel</u>.  My experience is set forth at 1-7 *supra*.  Otherwise, this criterion is best assessed by the court based on the record before it, including the supportive declarations filed herewith by numerous counsel acquainted with my civil rights work generally and with my work done on this case. The work done by the others from my office on this case was excellent; nevertheless I have exercised billing judgment in substantially reducing the hours for which compensation is sought for their work, as for my own.

39.  <u>The Undesirability of the Case</u>.  This case was not undesirable as a matter of the identity of the plaintiffs or the relief sought.  Procedurally and as a practical matter, however, it was undesireable.  Litigation under 42 U.S.C. §1983 is generally thought of – and properly so – as difficult, given the myriad defenses available to defendants in such claims.  Few lawyers in private practice in Virginia take these cases, and I know few if any who take them as frequently as I do.  More specifically, I anticipated that the defense would concede the constitutional claim and then move to dismiss the case as moot.  Just this initially happened in *Porter.*  Were the case dismissed as moot, this would cost my firm a fee for the abundant work we had done over the years to achieve this result.  While I was prepared to risk this result, it did not come to pass, as the defense side-stepped the constitutionality of the provision at issue, thereby making it necessary for the matter to be adjudicated by the court and permitting a fee award were plaintiffs to prevail, as they did.

40.  <u>Relationship With Clients</u>.  I was acquainted with Amelia Spencer from her work as a law student intern in my office during the Spring 2019 semester.  *See* ¶13, *supra.*  I became acquainted with the other plaintiffs after learning of their interest in joining the suit.

41.  <u>Awards in Similar Cases</u>.  I have not been able to identify similar cases to this one, however, there exists substantial case law attesting to the reasonableness of the hourly rates sought here for fee awards in civil rights cases under 42 U.S.C. §1988.  The reasonableness of these rates is also attested to in the supportive declarations filed herewith.

To calculate a fee award a court "must first determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate."  *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 243 (4th Cir. 2009).  In determining the reasonable number of hours and a reasonable rate, the court may consider the twelve *Johnson* factors reviewed above. 488 F.2d 714, 717–19 (5th Cir. 1974).  There is "a strong presumption that the lodestar represents the reasonable fee."  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (internal quotation marks omitted).  Notably, the Supreme Court has emphasized that the lodestar amount is presumptively reasonable once calculated in a particular case, and thus, may be adjusted only "in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee."  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010).

The *Vienna Metro* matrix has been adopted by courts in this district as a reasonable indication of appropriate hourly rates for attorneys and their staff in Northern Virginia.  *See Vienna Metro LLC v. Pulte Home Corp.*, No. 1: 10–cv–00502 (E.D. Va. Aug. 24, 2011); *Tech Sys., Inc. v. Pyles*, 2013 WL 4033650, at *6 fn.4 (E.D. Va. Aug. 6, 2013) (accepting *Vienna*

*Metro* Matrix).  The *Vienna Metro* matrix, first employed in 2011, provides the following hourly

rates by years of experience as of that year:

| Years of Experience: | Paralegal | 1-3 | 4-7 | 8-10 | 11-19 | 20+[7] |
|---|---|---|---|---|---|---|
| Hourly Rate: | $130-350 | $250-435 | $350-600 | $465-640 | $520-770 | $505-820 |

Since its development in 2011, this matrix has been used routinely by the courts of this district in

awarding attorneys fees in all manner of litigation:  *Vienna Metro LLC v. Pulte Home Corp.*, No.

1: 10–cv–00502 (E.D. Va. Aug. 24, 2011) (commercial litigation); *Taylor v. Republic Servs.,*

*Inc.*, No. 1:12-CV-00523-GBL, 2014 WL 325169, at *5 (E.D. Va. Jan. 29, 2014) (Title VII

employment discrimination case)*; Burke v. Mattis*, 315 F. Supp. 3d 907, 913 (E.D. Va. 2018)

(employment discrimination under Title VII and Rehabilitation Act; *Antekeier v. Lab. Corp. of*

*Am.*, No. 117CV786TSETCB, 2018 WL 5075509, at *4 (E.D. Va. Aug. 29, 2018) (Buchanan,

J.), report and recommendation adopted, No. 1:17CV786, 2018 WL 5043844 (E.D. Va. Oct. 17,

2018) (Elllis, J.) (FMLA case) ("The *Vienna Metro* matrix is applicable in this case, as it has

been in other recent civil litigation cases before this Court. . . In light of the applicability of the

*Vienna Metro* matrix, the rates of Plaintiff's counsel are reasonable, as the hourly rates of each

attorney, law clerk, and project assistant fall within the *Vienna Metro* matrix."); *JK Moving &*

*Storage, Inc. v. Winmar Constr., Inc.*, 2018 WL 4365573, at *3 (E.D. Va. June 20, 2018)

(commercial litigation $650/hr. for attorney with 37 years' experience); *Alvarez v. ReadyClean*

*Indus. Servs., Inc.*, 2015 WL 5793605, at *3 (E.D. Va. Sept. 29, 2015).

For decades, my practice has depended on court-awarded fees or fees paid by defendants

in lieu of contending with an application for an award of fees.  I have thus kept abreast of hourly

---

[7] I have practiced civil rights law in Alexandria since 1976.

rates charged and received by firms with experience comparable to my own and those of my office colleagues. The hourly rates sought here are on the low end of the *Vienna Metro* matrix, which logs fees charged by and paid to local counsel for work comparable to the civil rights work done by this firm. *See*, supportive declarations filed herewith. My rate and my firm's rates in general are decidedly lower than those under both the initial and revised *Laffey* matrix in use in the District of Columbia, where I am also licensed and have litigated cases in both federal court and Superior Court, most recently *Hinett v. British School of Washington,LLC,* #2017-CA-6005 B (Super. Ct. D.C. 2019) and *Izuka v. Clark Realty Capital, LLC*, #1:18-cv-2087 (D.D.C. 2019). The matrixes can be viewed at: https://www.justice.gov/usao-dc/file/796471/download and http://www.laffeymatrix.com/see.html.

Costs

42. I request an award of costs in the amount of $3,200.40, per the itemization attached hereto as Exhibit 11, covering May, 2014 to date. The largest expense, $1,638.10, is for photocopying, including of many articles on relevant subjects, multiple drafts of all major filings for editing by in-house colleagues and myself, and multiple copies of the substantial filings made when the lawsuit began and thereafter as in-house working copies and as copies for chambers ($1,054.20 in August and September, 2019). I do not seek reimbursement for my purchase of the numerous books and articles referenced in ¶9, costing several hundred dollars, or the book filed with the court with copies to defense counsel. The other costs are as follows:

| | | |
|---|---|---|
| Filing Fee | $400.00 |
| Postage | 66.04 |
| Process Server: 3 defendants plus courtesy copies to the attorney general and the governor: day after filing | 250.00 |
| Westlaw legal research | 665.00 |
| FedEx (pleadings to defendants and counsel) | 169.76 |
| Parking | 11.50 |

Each of these expenses was appropriate for the proper and efficient development and litigation of the case during the years it was in my office.

<u>Summary and Conclusion</u>

For the work done on this case in the period April 2014 to date, I request an award of fees and costs in the following amounts:

| | | Hours | | Rate | Totals |
|---|---|---|---|---|---|
| * | For my work: | 257.2[8] | x | 600 | $154,320 |
| * | Bernadette Valdellon | 30 | x | 250 | 7,500 |
| * | Charles Tierney | 40 | x | 250 | 10,000 |
| * | Stacey Gray | 40 | x | 120 | 4,800 |
| * | Mikaela Phillips | 100 | x | 120 | 12,000 |
| | Total requested fee: | | | | $188,620 |

---

[8]This represent 207.2 of the 266.9 hours posted for me on Exhibit 2, plus 50 of an estimated 500 hours of reading as set forth in ¶9, *supra*.  Reduced hours appear for all other timekeepers as well.  *See* ¶27, *supra*. *N.B.* the time records received by my affiants did not list my final 7.2 hours spent on the motion to enforce the court's order.

Costs requested:                                          3,200.40

Total requested:                                      $191,820.40


Dated: November 6, 2019                    //s//   Victor M. Glasberg
RaceCase\Pleadings\FeeDecVMG(2019-1106)          Victor M. Glasberg




<u>Certificate of Service</u>

     I, Victor M. Glasberg, hereby certify that on this 6th day of November 2019, I electronically filed the foregoing Declaration of Victor M. Glasberg in Support of Application For Award of Attorney's Fees and Costs with the clerk of the court.


<u>//s// Victor M. Glasberg</u>
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
<u>vmg@robinhoodesq.com</u>

Counsel for Plaintiffs